If it may please the Court, Jeff Tillotson here on behalf of the Appellant SCA Promotions. This case involves a contractual interpretation of a cancellation provision. We submit the District Court erred when it construed that provision to be tied to how much in fees had been paid at the time the contract was cancelled as opposed to the fees paid under the contract. There are three important facts that we believe the District Court missed that drove its error. First is that this was a contract to provide coverage for a billion-dollar contest for the NCAA tournament that Yahoo! was going to run. SCA was then obligated under the contract to arrange to provide payment if someone was to win the billion-dollar prize. Fact two that the District Court missed was that the contract provided for a contract fee of $11 million. That was derived from the contract into invoices that were attached to the contract that specified the total amount of the fee. Third, that fee was then paid in two installments according to those invoices, $1.1 million up front and then $9.9 million in February of the following year. The contract contains a cancellation provision and there is no doubt that Yahoo! cancelled the contract in January of the following year. And that cancellation provision provides for the ability for Yahoo! to cancel, get a refund, but then have a cancellation penalty they have to pay my client. Significantly, that penalty was phrased using the following language. A cancellation penalty of a percentage of the fee will be paid to my client. Will be paid. Now, the issue here is what is meant by that word of the fee from that cancellation provision. We would submit the only logical construction of that provision is that my client would get paid a percentage of the total contract fee, the $11 million. The district court in Yahoo! claims that's wrong. It's however much they had paid at the point they cancel, adding a temporal limitation to it. So that they would read it of that you would get a 50% in this particular case because that was the cancellation fee. 50% of the fee paid to date would be paid to my client. We believe that the language and the structure of the party's contract really drive the interpretation we offer. First, the structure. This was a somewhat unusual cancellation provision because it allowed for a full refund if they cancelled, but then had an actual cancellation payment to my client. So it wasn't an offset or a reduction. It was... A full refund of the deposit, right? Well, yes, of the full refund of whatever had been paid at that point in time. And so there's only two payments, so the timing really only matters until that second payment is made. But the cancellation penalty has a gradation of percentages, 25% if you cancel early on, 50%, and then 75%. So the cancellation penalty does go up over time, but what the district court added on top of that was it's not just the penalty goes up, it's also derived off what you've paid so far. But the language of the provision in no way imposes a temporal limitation on the word fee, and it uses forward language. You will pay this cancellation penalty after the refund. Now, the only way that language can work, that you'll have this mechanism where we refund and they pay, is when the possibility that the amount they owe us as the cancellation penalty is greater than the refund. And that happens up until they make that second payment. They do a $1.1 million payment, but at that point in time under our interpretation, the cancellation penalty is always going to be higher than the amount you paid until they make that final payment, and then it will be lower. Under that scenario, the language works, will be paid. If you adopt Yahoo like the district court's interpretation, the will-be-paid language is meaningless. It's always a holdback of the refund, because under Yahoo's world, it's always a percentage of whatever they've paid. So there'll never be a situation where Yahoo is paying us more as a cancellation penalty than what they've paid us. The language would read, under their view, that there's a cancellation penalty, we give them a refund, and we get to keep a certain percentage of what they've paid. That language is not in the contract, and there's no temporal language. Instead, it just uses the word fee. Now, the contract uses fee and fees and contract fee somewhat intermittently through the agreement, and unfortunately there's no defined terms that clearly say it. But the structure of the way it works— Isn't there an interpretive canon that the singular usually includes the plural? Yes, Your Honor. Well, you didn't cite it. That's why I'm asking. No, in this particular case— I think there is in statutory construction. In this case, there is a way to define fee versus fees versus contract fees, the way the parties work, because there was the possibility that there could be a greater fee than the $11 million. Well, right, for the $10 million. So if more people entered, there was a higher fee, and then you had additional invoices that were not part of the contract at that point in time. Well, I found both sides' arguments about fee and fees very confusing, but it wasn't clear to me that any of those were truly systematic and coherent. Your Honor, in candor I will agree there doesn't appear to be a master design for how they're using fee, fees, and contract fees in that sense, except in the sense there is never the words used paid to date anywhere or a temporal limitation on any of the contracts of fees. So the cancellation fee does not say we get a percentage of the fees paid to date. It says the fee. And the only fee used in the contract is the contract fee plus any additional amount owed. So if, in fact, the parties were attempting to limit the cancellation penalty to a temporal limitation, you would use that language to make it clear. You would not use the language the fee because that's the contract fee. And then on top of that, you have the structure of the provision, which says that the fee, the cancellation fee, will be paid, which clearly allows for a situation where the cancellation fee would be greater than the amount that we would be refunding them. That's the only way it works. What the district court did was it kept adding, and as Yahoo does in its brief, the following language, the cancellation penalty of 50% of the fee paid to date, or at the time you cancel. That language keeps getting added to the cancellation provision, which then imposes that limitation on it. Now, if you take a step further with Yahoo's interpretation, you get into the land where you find absurd results. So, for example, on February 14, according to Yahoo, of 2014, the cancellation fee is $550,000. But on February 16, two days later, even under Yahoo's interpretation, the cancellation fee is $8.25 million because a $9.9 million payment would have been made on February 15. This court recently issued a decision called Jacked Up v. Sarah Leaf from Judge Prado on April 25, 2017, where he talked about constructions that seem to make no economic business sense, that there's not a seemingly rational reason why you would have that disparity between February 14 and February 16. It doesn't seem to make sense that the cancellation fee is tied to how much I've paid you so far. Well, I think what Judge O'Connor implied here was that it doesn't make sense that the fee language should be in this way with these dates and so on, whereas the payment dates were completely different and you could have altered the payment dates and alleviated this problem. Your Honor, you could have altered the payment dates through the invoices, which to me offers little rationale that the parties would tie it to the amount paid by a specific date because those could float. Furthermore, the parties did include a schedule for the cancellation fee depending upon when you canceled, 25 percent, 50 percent, 75 percent. So there was clearly an intent that the cancellation fee would go up the closer you got to the tournament, the NCAA tournament, before you canceled. There appears to be no intent that the parties wanted to tie that to when payments were made through the invoices. And indeed, if you logically take it out, you won't know the total amount of people that entered the contest until the day before the tournament actually literally starts, and then you would invoice that amount and it would be due in 30 days. You wouldn't even have that amount due until after the tournament ended. And so under Yahoo's scenario, the cancellation fees could even be different after the tournament. That's why you said this was all negotiated independently and carefully and so on. Is that why the $9.9 million wasn't due until the day before the tournament began? It was actually due before. It was due on February 15th. The NCAA tournament would have started in March, but it was staged in those two payments. There is work to be done, even though you agreed to it. Yahoo has to come up with the rules for the contest and the promotion and do it. And so you had this two-tiered payment system of some money up front, and then the remainder paid on February 15th. It wasn't literally before the tournament, but it was closer in time. Yahoo could cancel up to 15 minutes before the first game. So the time period in which they could cancel ran the entire scope of when they've paid $1.1 million until they've paid the full $11 million during that time period. Literally 15 minutes before that first tip-off game on Tuesday, Yahoo could call and say, we don't want to do the promotion. The significance of that is that nowhere do the parties attempt to tie that to how much has been paid at any particular point. They just tie the cancellation fee to the dates, and it goes up. It's kind of weird. It's an all-or-nothing proposition. I mean, ordinarily the cancellation provision or whatever might be set so, okay, if you back out and pay the penalty, I still have time to do the deal, as alleged here, with somebody else. Whereas with this, you can cancel 15 minutes before tip-off. You know, it's too late to do another deal. So, I mean, I'm not saying that's dispositive of these issues, but it's a little, to me, odd. Everything is pitched on these two parties. It seems all the more care on how you get out because the deal can't be done with anybody else because you let somebody get out so close to the tournament. You can't stop the tournament. It's going to start. Well, Your Honor, that plays into the fact that my client has to arrange for underwriting behind them through heavy players, and so those individuals in connection with us have to commit capital early on. You have to have the money ready to pay before the tournament starts. We're required to get that. And so the notion of the cancellation penalty as you get closer to the tournament is we've locked up that capital for longer periods of time. That's why the penalty goes up over time. If you cancel literally, if Yahoo had a change of heart 18 minutes before the opening night tip-off of the tournament, we've committed the capital for the full period of the tournament. Keep in mind the contest was over, this particular case, by early round two. Everyone was out. So your capital is really during that run-up period because you're gambling. No one gets that particular far. Let me ask you something about that email from Yahoo's senior marketing manager. You rely on that because it indicates that the percentage of the cancellation penalty would be based on the full $11 million fee. That's pretty specific. It is, Your Honor. Was that ever denied or withdrawn by Yahoo? It was removed from the contract, not because they disagreed with the amounts, but the testimony was because my client didn't want the specific fees in the contract he would be providing to the underwriters. So there was never a denial that that's not how it works. They just agreed not to include the specific amounts. We would argue that, first of all, it's a smoke. But the percentages would stay? Percentages stayed. What's in the parentheses? Take out the dollar amounts, correct. Which is what you need to control your argument that it's based on the full $11 million. Correct, Your Honor. But there's no email track of afterwards saying, no, we don't like that, or we've backed off from that, or we think it should be the amount paid. And you can see it's a significant difference. The parties would have really addressed that. And it was removed at our insistence because we don't necessarily tell our underwriters the total amount of fee we're making. We negotiate with them to pay them for it. No, I'm sorry. Yes, well, it's as close to a smoking gun as you'll get. The smoke has cleared a little bit because we took it out. But it clearly lays to rest this notion that Yahoo thought it was tied to how much they paid. Because then you would have games playing. I mean, they could avoid paying that $9 million for a while to see how it goes, and they would never have an upside of the cancellation fee. And so you have this notion that it doesn't seem to be what the parties addressed. One last issue I want to address in the few minutes I have remaining is there's also a limitation of liability provision, which the district court judge used to say, here is proof. And that language is that the party's liability was limited to the amount of fees paid by sponsor hereunder. The district court in Yahoo continually removed the word hereunder and substituted, in effect, the amount of fees paid by sponsor to date. To date. We submit that the word hereunder means effectively in accordance with the contract, the fee we've agreed to, not the fee paid to date. What are you saying? It was unclear to me in your brief whether you were saying that the contract is ambiguous and even if we went with you, we should remand for trial, or whether you were saying the contract is clear and summary judgment should have been granted in your favor. We argued alternatively, but we do believe the contract is clear, that this court could reverse and say that the district court was wrong to deny our summary judgment and render on that ground, that the contract provides the cancellation fee in the amounts that we say. We have argued in the alternative to the extent there is some dispute, there is an ambiguity regarding the word fee and regarding the word the amount of fees paid by sponsor hereunder. We think the extrinsic evidence which we've submitted clearly shows what the party's intent was, but at the very least there would be that dispute in it. But we have asked that we think it was clear. Thank you, Your Honor. I appreciate it. Thank you. Mr. Jolson. May it please the Court. Thomas Patrick Lane on behalf of Yahoo! A pleasure and a privilege to be before the Court again. This, from Yahoo!'s perspective, is a straightforward breach of contract case with clear language, clear terms, and clear provisions. Lawyers always like to say things are so clear, but they mutually negotiate multi, multi pages of paragraphs and sheets of paper, et cetera, and toss it up for three judges to tell them what they really meant about things that are abundantly clear. The good news is we have Judge O'Connor's decision related to this, and I want to respond to a couple of questions that came up on my opponent's argument. And I'll start with the last set of questions related to what's been referred to as the smoking gun that Judge Clement brought up. There are, and I don't think we need to get to extrinsic evidence here, because I think the contract is unambiguous, as Judge O'Connor found. However, if this Court does decide to look at extrinsic evidence, there is a whole host and wealth of evidence related to what was happening in the negotiations between the parties in the fall just before the contract was signed. And there is the email that was referred to by Marissa Bataille. However, she did not sign the contract, nor was she involved in the end negotiations. The person who was was notified and scheduled for deposition, but SCA decided not to take her deposition. And there's an email in the record at 6388. That person's name is Thido, T-H-I-D-O. And she says that December 26, 2013, with respect to the clarifying language of cancellation, sub 2 in her email to SCA, clarifying language regarding the cancellation fees in Exhibit A, Section 2K, in the event the contract is canceled, Yahoo should get back all amounts paid to SCA subject to these cancellation fees. These fees are not payable on top of the fees Yahoo pays to SCA out of the contract. And as Judge O'Connor and the District Court pointed out, there are multiple provisions in the actual contract itself that refer to fees paid. There is Section 4B. There is Section 2K under Exhibit A. And there is Section 2 under Exhibit B. All of those refer to fees having been paid, which at the time Yahoo canceled would have amounted to, as the District Court found, $550,000. In addition to that, in addition to 4B, 2K, and Section 2, I would point the Court in comparison to what my learned colleague said about there being no temporal constraints on the invoices, Section 1 of the contract says in its very last sentence of Section 1, Other than as specified herein, the fee, parens, S, fees, payable to SCA hereunder, are nonrefundable and are fully earned on the specified due date. That's extraordinarily important language for the Court. Are not fully earned until the specified due date. The specified due date for the remaining payment was not until February 15th, before the March Madness was to launch, but after the cancellation letter that went from Yahoo to SCA. So not only do we have three different sections that Judge O'Connor relied upon in terms of the past tense of fees paid, but we also have at the very beginning of the contract that fees are not earned until the specified due date. Judge O'Connor didn't really focus on that, did he? No, Judge Jones, he didn't. I mean, I noticed all this argument about fees earned in your brief, but I never really, I mean, that would have created a fact issue. He did not focus upon it. To be fair, there have been a variety of arguments that have been raised, some by SCA, some by Yahoo, during the course of summary judgment. He did not specifically call out paragraph one. However, reading the four corners of the contract, in addition to the paid references throughout not only the contract, but the two exhibits attached to the contract, and this section one where fees are not fully earned until the due date, I think makes clear to this Court that it was unambiguous that Yahoo is not, should not be held responsible for what is now characterized as a $4.4 million fee. Under SCA's analysis or explanation of the contract, had Yahoo canceled a day, an hour, or a minute after the contract was executed, Yahoo somehow would owe $2.75 million. That is not a reasonable interpretation. That's what the email said from Yahoo's senior marketing manager. You are correct, Your Honor, Judge Clement. How do you avoid that? Well, if we get to the point where this Court determines that the contract is ambiguous and the Court wants to look at extrinsic evidence, there is a whole host of extrinsic evidence that contradicts that. Separate and apart from Ms. Bataille not being a lawyer who was involved in drafting the contract, separate and apart from her not being the third to be sixth witness on damages, there is an uncontroverted affidavit from TDO, T-H-I-D-O, who was our attorney. That you referred to earlier. Right. Who was our attorney negotiating the contract, and there is an email, which I put into the record a little bit earlier, where she specifically is talking about fees to be repaid. So the whole of the extrinsic evidence, I think, contradicts Ms. Bataille's email. She was speaking, of course, with SCA. She had conversations with them. But she was not the chief negotiator, and there are multiple emails, not only from Ms. Doe but also from Clifton Ma, who was an attorney also involved in the negotiation. None of them signed off on the contract. So if we were to get to an extrinsic evidence consideration position, I think there's a variety of different emails, different documents, different drafts, and different testimony that contradicts that. Did Yahoo file a counterclaim for the refund? We had a variety of counterclaims. We believe that our counterclaim related to fee forfeiture was included within our breach of contract counterclaims. So we can talk about the Rule 60A analysis. However, I think it was encapsulated within our answer, our affirmative defenses, and our counterclaims. Sort of vaguely referred to? I wouldn't say vaguely referred to. I believe it was explicitly referred to. It certainly was provided with notice to SEA from before they sued us, three days after we canceled the contract in late January. So they've always been on notice that we were seeking forfeiture and refund. We did that in our demand letter, and we did that in the answer, the affirmative defenses, and the counterclaim. So when was that first raised? It was first raised in January of 2013, I believe it was. I'm sorry. It was January 27, 2014. It was first raised there. It was reiterated in our answer, affirmative defenses, and counterclaim. Interestingly, on the Marissa Bataille email, she was deposed in the case, of course, even though she was not 30 v. 6 on damages. She was never asked about her email, and she was never asked about Tito's email in terms of the refund. And as I said earlier, Tito was never deposed, even though she was offered for deposition. And I think the court does not need to get to extrinsic evidence. First, I think looking at Judge O'Connor's decision, I think the court can rely upon the four corners of the agreement itself, where in addition to Section 1 that I've pointed out to the court that fees are not fully earned until the due date, there is also, of course, Section 4B, where the agreement explicitly says, excluding the indemnity obligations of this paragraph 4B, where each party's liability in connection therewith shall be limited to $11 million, and other than both parties' obligation for payment of the prize amount in the event of a valid, verified winner in the promotion, the party's liability to the other are limited to the amount of fees paid by a sponsor. And I know there's a lot of discussion in the briefing by SEA that this is not reasonable because Yahoo could somehow get out of the contract by paying nothing. I think that that paragraph is a red herring in the interpretation of the cancellation fee provision because that is obviously referring not to somebody canceling the contract before it goes through. It's limitation of liability. And in the context that it refers specifically to somebody not collecting the prize or some other breach like that or somebody suing for fraud or whatever, I really do think that Judge O'Connor got a little off track in using that, casting that back to interpret the cancellation provision. Well, Your Honor, I respectfully disagree, and let me tell you why. Because not only does it appear there, but it also appears in Exhibit A and Exhibit B to the contract, which repeatedly refers to fees paid. Yes, but everything in a contract like this is going to depend on how much one party is paid to another. So that, in this context, it means after the contract has been performed and somebody sues you, a third party sues, then you're not going to be, you know, if you have a cross-claim against the other, you're not going to be liable for more than $11 million. With respect to that particular paragraph, Your Honor is obviously correct. It refers to indemnification and total liability. However, if we look at Exhibit A, Section 2K, which says about cancellation fees, which is what we're really dealing with here, 2K says cancellation fees, upon notice to SEA to be provided no later than 15 minutes prior to tip-off of the initial game, YAHOO may cancel the contract. In the event the contract is canceled, YAHOO will be entitled to a refund of all amounts paid to SEA. This is not tied to indemnification or some other suit that may exist. No, I think 2K is the crux of your – interpreting Section 2K is the crux of the disagreement between both of you, and my position is that the indemnification language is a general provision, which is unusual canons of interpretation overcome by the specific, which is the cancellation fee provision. That's why I was saying it was a red herring. I understand Your Honor's point. I'm pointing out 2K as well as Section 2 under the miscellaneous provisions of Exhibit B, which also buttresses 2K because in Exhibit B we also see where it says excluding the indemnity obligations of Section 4B, other than the party's obligation for payment of the prize amount in the event of a valid, verified winner, a promotion, the party's liability to the other are limited to the amount of fees paid by a sponsor hereunder. And I think looking at the four corners of the two exhibits on the contract, what the parties clearly meant was that YAHOO's liability in certain stages was limited to the amount of monies that have been paid. That's also consistent with Section 1. So why? That means SCA could have sued you for cancellation fee plus consequential damages or incidental damages up to $1.1 million. Isn't that the logical extension of what you're saying? SCA could sue us for their actual damages, which were $4,400. Well, I'm just saying hypothetically the extension of what you're saying is that $1.1 million was the party's agreed, quote, limit of liability to each other irrespective of the cancellation fees provision. Yes. I mean the party's liability limit. And, in fact, suppose SCA had paid one of the underwriters an additional half million dollars, $750,000 or something, by the time that you canceled. According to your interpretation, your backward-looking interpretation of the party's mutual limits of liability, they would have a very strong argument to cancel out your $1.1 million altogether. But, Your Honor, there was no – that is, respectfully, a hypothetical upon a hypothetical upon a hypothetical. And it's based on your interpretation of the party's mutual limitation of liability general provisions. But SCA never placed coverage with anyone, nor could SCA place coverage with anyone. You know what I'm saying. I'm talking about contract interpretation based upon a very realistic potential hypothetical, which to me suggests that the parties did not mean to tie their mutual limitation of liability provision to the cancellation provision. That's all. And I respectfully disagree with Your Honor in light of the clear language that is repeated three times – actually, I think four times in light of Paragraph 1 related to money is paid, which is what Judge O'Connor ruled. In addition to that, in terms of the numbers that we're actually talking about, separate and apart from the extrinsic evidence – and there is an email in the record, which I've cited, which talked about 10 percent of the contract fee – we have cited a variety of cases, to Your Honors, related to unreasonability and absurdity. When you've got a $4,400 expense, which is all that's in the record that SCA laid out, $4,400. And at varying times during the course of this litigation, they have sought either $9.9 or $4.4 million, with $1.1 million in the bank. And I would suggest to Your Honors, in terms of whether it's Midwest, Continental, or the other cases that we've set forth, there's no scenario under this contract where Yahoo's liability would be zero. And saying that in the papers, as SCA did, is simply false. There is liability there, and it's limited, under the three terms of the contract, to what Yahoo paid. And it paid it up front. There was never a situation where Yahoo was not on the hook for something. In terms of our own appeal, we haven't really addressed that. However, I will point out, obviously Judge O'Connor dismissed our two breach of contract claims, which are the two that were appealing to the court. In terms of the performance claim, the clear evidence is that SCA, as an insolvent corporation, never could have covered the debt. What has that got to do with it? What's your counterclaim about? We have two counterclaims that are before the court. I understand that. And one of them is misuse of confidential information. And what is insolvency? Insolvency doesn't have anything to do with that. What does it have to do with it? We have a second breach of contract claim. But you didn't, I mean, is that what you call, what do you call preemptive breach? Anticipatory breach? You didn't, you canceled. They didn't, you canceled. How can you sue for breach when you canceled? Because they could not have performed under the contract. But that clearly wasn't why you canceled. You canceled because Yahoo got a better deal with Berkshire Hathaway and Quicken. Your Honor, I respectfully disagree that we got a better deal with Berkshire Hathaway and Quicken. What happened was they went first to market. And in marketing promotions like this, being first to market is the be all and end all. But Yahoo paid less in the end and became a cosponsor of the promotion, did it not? We may have paid less in the end. However, we were not the sponsor of the promotion in and of ourselves, which was the whole point of contracting with SCA and trying to get to market first, which in terms of a promotion like this, the key is getting out there in the marketplace first. As far as the second breach of contract claim is concerned, it became clear to us during the course of discovery that SCA never could have lived up to the promises it made related to liability. It never could have covered the debt related to liability and had no intent in doing so. So suggesting that the official rules should have been presented earlier or they should have been signed off by DE Shaw, SCA under the four corners of the agreement agreed to take on the liability, and it could not. It didn't agree to do it before January 15th, which as I recall was the date of cancellation. No, Your Honor. I respectfully disagree. In the terms of the agreement itself, which was signed by SCA in December 27th, 2013, it agreed to take on the liability. Yes, but obviously it was going to take a while to procure that, right? Never mind. I'm not going to argue about that. There is a provision of Texas law that if you breach a contract, you can't sue for performance. Is that what you're doing here? We are not suing for a specific performance with respect to it. No, you can't sue for damages. Correct. We are suing for damages under the breach of the confidentiality agreement and under the breach of the contract. You cannot sue for damages for breach. Right, but we don't. It's our position, Your Honor, that we did not breach the contract. We complied with the contract. The party that breached the contract, as Judge O'Connor, I believe, found, was SCA and not Yahoo.  We paid the $1.1 million up front pursuant to the terms of the contract. Judge O'Connor simply found that we're entitled to a refund of the $550,000. He also found that our two breach of contract claims, which we've now appealed to the court. Meritless. Correct. He found that they did not have merit. We disagree with him on that point. All right. Thank you, Mr. Lanyon. Thank you. Got your argument. All right. Thank you, sir. Back to Ms. Tilson if you have any rebuttals. If it may please the court, let me just address the issue regarding the emails and the attempt to distance themselves from Ms. Bataille, who was their corporate representative in discovery. With due respect, sir, don't spend too much time on it because this is a language case, not an emails case. I agree, Your Honor, except to the extent that Yahoo wants to claim that in the course of dealing with us, they communicated something different than what the contract means. And by citing some email from Ms. Ty Doe, which he said was at the record 6388, I encourage you to look at that email. It is consistent with what we've always said, which was Yahoo was concerned. They didn't want to have to, if they canceled us, keep what they've paid us and have a cancellation fee. And they attempted to clarify that. We get back our fees, right, and then we pay you the cancellation fee, right? If you look at that email, it's very clear that that's what they intended. And I will point out that it was Ms. Bataille from Yahoo who inserted the dollar amounts in that email and sent it to us. So that is the predicate by which we say the provision and the cancellation provision must work as percentages of the overall contract fee. That said, I do agree that the biggest flaw in what Judge O'Connor did was he attempted to use the limitation of liability and really overlap it on the cancellation fee in a way that the contract does not suggest. And it made it sort of a double reduction. Overall liability is reduced to the total amount paid on that date, and then the cancellation fee provisions further reduce what you get. And there is no evidence in the contract or the structure of the way it works that that's what the parties intended. The cancellation fee is within a provision dealing with liability and indemnification, and what happens if someone doesn't get paid on the claim or there's some liability resulting from it, the cancellation provision obviously deals with what happens before you get to the contest, and they stand alone. What we attempted to do was to construe them in a way that they were consistent and that they're both tied to the contract fee. Limitation of liability is limited to the total contract fee of $11 million. The cancellation provision is a percentage of that $11 million, depending upon when you cancel. And we thought that harmonized both provisions, although we've never agreed that the liability provision somehow construes or comes onto the cancellation provision itself. With respect to the other arguments, they're also irrelevant, that somehow this is an unreasonable fee or we were insolvent or we tried to lure them in. None of that goes into the actual interpretation of the contract. The only evidence that was put in the record was the cancellation provision was requested by the underwriters who were going to have to commit capital and we were going to have to pay them a fee to do that. And what would happen if Yahoo wanted out before the contest? And that was the origin of this particular provision, and they obviously thought the amounts were okay because they suggested those amounts to us. With respect to how we got here at the end with respect to the Rule 60A motion, I just do want to respond to one comment. The reason why he was talking about discovering what happened is because the claim for a refund was never alleged until the close of discovery when they amended their petition. And even then, that's the first time they raised the limitation of liability provision, but they never added a counterclaim for a refund. He says, well, we did at the very beginning. The letter they wrote to us at the very beginning from their in-house counsel demanded all the money back and said we breached it. The notion of a refund only came in their summary judgment motion where part of their prayer for relief among the myriad of relief they asked for, they asked for a refund. And Judge O'Connor, in his memorandum of opinion, didn't order a refund. He just said, this is how I think the contract works. And it was only with the Rule 60A motion that he then said, I think I'm going to technically correct my order and add this in. And that's why we thought it was improper, although we don't think the court needs to reach that. Thank you. Mr. Pilsen, thank you. Counsel on both sides. This concludes the orally argued cases for our panel this week. Today, along with the non-orally argued cases, will be submitted. The court stands adjourned.